The United States Court of Appeals for the Federal Circuit is now open and in session. God Save the United States and this Honorable Court. Thank you and good morning everyone. The first argued case this morning is No. 19-1683 Kellogg Brown & Root Services v. Secretary of the Army. Mr. Ho, proceed. Good morning your honors and may it please the court. This case is about a contractor who on very short notice arranged to supply desperately needed living trailers to troops in Iraq in the early stages of the war. Mr. Ho, let's assume you're right about the government's obligation to provide security that that obligation was breached and that you have damages if you can prove them. My problem here is to use the jury verdict method, which is what you say ought to be used, there has to be proof that no other method is available. And I don't see that that has been done here. I don't see that you have shown the inability to get cost data from your subcontractor or in some other way to do what is usually done to prove damages in cases like this. Could you address that please? Certainly your honor, thank you for the question. I think the court's instructions and decision of the Delco Electronics decision is instructive on that point. In Delco, the contractor did not... Please, I'm asking you a question about the record in this case. Please tell me what it is that you did to attempt to prove damages so that I can understand whether you have shown that there is no other method available. Well, the method that was used and I will speak about the delay claim. The method that was used was to develop a delay day model. There were actually five models that were presented to the board, one by the government. And then secondly, to apply to those delay days a price that was developed from the marketplace to assess the value of a delay day or value of a day that the trucks were not moving. What is the data that is used to show what you call the price? I mean, you would have thought that there would be evidence as to how many trucks there were, how many days they had to sit idle, but we don't have that, right? Well, there were models. Estimates are often used and REA requests recordable adjustments, so it was a modeled estimate. The dollar value applied to those delay days was based upon information that was provided by the subcontractor and vetted by KBR given its experience in theater. Originally, the subcontractor proposed a $500-a-day figure. KBR checked with its sources, other subcontractors, its own experience and determined that was excessive and brought that down to an agreed $300 per day. What was the basis of that $500-a-day proposal, the factual basis? Your Honor, candidly, it came from FKTC and it was based on, I believe, their experience. I think the important point is that the $300 that KBR determined would be the basis for the settlement was based on their own experience, their own vetting of those numbers, their own checking with others. What was done? What was done? Mr. Ho, can you hear me? I can. Then don't talk while I'm talking. I'm sorry. I heard another judge break in. I apologize. Mr. Ho, you say, candidly, it was based on their own experience. Candidly, you don't have any factual knowledge in the record, do you? In the record, as I said, the price was vetted by KBR given its own experience. If you want to call that an estimate, it's an estimate if it's based on actual experience. You're not answering my question, Mr. Ho. Please listen. The subcontractor provided no factual basis for its $500-a-day estimate, did it? I don't believe it did. It was a claimed number. In the private security opinion, on page 19 of the blue brief, KBR asserts that we, quote, of the government's contractual promise to provide military escorts to KBR and its subcontractors under Log Cap 3, close quote. Where in private security did we address and decide the issue of whether timely force protection was an essential element of Log Cap 3? Because I can't find it. The Board of Contract Appeals, Armed Services Board, made that finding, and you're correct. Your court did not address that issue because it was not appealed by the government, but you did affirm the court's case. Mr. Ho, so your statement on page 19 is incorrect, is it not? We attempted to make that distinction, and if it isn't precisely stated, I apologize for that. But the actual fact is that your board accepted the ASPCA decision, although that issue was not before it. But the underlying finding of the ASPCA was that there was a material breach. Mr. Ho, it must be clear that what's bothering us is the absence of precision in all of this. And I think it's not in dispute that there was some sort of breach because there was certainly an obligation to provide security that wasn't provided. Did the government propose an audit of any sort of the numbers that were eventually provided after KBR and the subcontractors negotiated the final price, which, as I understand it, KBR paid the subcontractors? Was there any government audit or request for audit in the course of your claim for reimbursement? Yes, there was, Your Honor. The government did review the settlement reached by KBR with its subcontractor. Its objection was that the settlement was not based upon actual cost data, but rather was based upon pricing data. And I just quickly refer once again to the Delco Electronics case. That was the facts in those cases. The government objected there because there was not cost of pricing data to support a change. Judge Margolis at the Court of Federal Claims said that was only one factor to consider in determining a jury verdict. That case is unpublished, correct? I believe that's true, Your Honor. So it's not binding on us. That would be true. Well, just to try and figure out the reasoning and whether at some point the government's action was reasonable or not reasonable, as I recall the record. First, at least they offered to pay a portion of what was requested, and then eventually said, no, we're not going to pay anything, which doesn't seem particularly reasonable other than their apparent concern as to where these numbers came from. And so that's really what I'm trying to understand as to what the obligation might have been on the government or on KBR to go beyond the round number that the negotiation produced. Well, I think Your Honor points to an important fact, and that is that the contracting officer did determine it was fair and reasonable to pay KBR $25 million for the subcontractor settlement and was open to receiving more information. That was subsequently withdrawn, actually the payment was made, and that it was subsequently withdrawn after I think DCAA indicated it was concerned that it was not based on cost of pricing data. What does the record show about the basis for the $300 estimate? It shows that KBR vetted that number with its past work in theater and got some advice from others who were knowledgeable on convoys in the area and determined that that was a reasonable price. $500 not reasonable, $300 was reasonable. This is Judge Wallach. I have some questions about the FKTC subcontract. The FKTC subcontract provided that if FKTC was delayed by the Army or KBR's failure to perform, it would be entitled to an equitable adjustment either in compensation or time or both if the delay substantially increased the cost to FKTC. Or the time that its equipment and forces are required at the site. Accordingly, the way I read it, FKTC was entitled to an equitable adjustment only if the Army failed to perform its obligations pursuant to change 5. Am I correct on that? I think that's a correct statement, Your Honor. Yes. Okay, so change 5 provided in relevant part that the Army would provide for the security of the contractor personnel in convoys and on-site commensurate with the threat and in accordance with the applicable theater anti-terrorism force protection guidelines, right? Correct. And KBR included similar language in the FKTC subcontract, right? Correct. As far as I can tell, nothing in change 5 or the FKTC subcontract identified a specific time by which the Army was obligated to place trailers into convoys. Am I right? There was no express time in the force protection clause, which is the language the board used, but the contract taken as a whole called for delivery of trailers on a specific date and at the same time promised delivery of force protection. Within those two provisions, there was an obligation, a promise by the government to deliver force protection to allow the contractor to meet that very specific delivery date. The Army was faced with a whole bunch of logistical problems at that time. Am I right about that? Yes, they were, Your Honor. And KBR appreciated that and had expressed current concerns about it in the time before executing change 5, right? That's in the record, yes, Your Honor. Okay. Well, no, no, it's in the record and it's also in the record that there were not sufficient escort vehicles or shooters being made available by the Army. That was KBR's position. I think that's not disputed by the government. Is that right? No, they do not dispute that. That was in the board decision. If I may, however, this is, as we view it, a contract case. And looking at the contract, just at the contract, the plain meaning of the contract, it set a priority for these living trailers. That was the very first, in the Statement of Work, the very first service that is mentioned in there and it goes into detail. It's the only service in those contracts that had a specific date shorter than the original date. Mr. Howell. Yes. Look, again, you've taken me right up to the point where I was going. Given everything else the Army needed to fight the war, in fact, trailers were a relatively low priority item. Isn't that right? They needed beans, bullets, mail, fuel, all the loggy logistical things that the Army needed to fight in a combat zone. Trailers are nice, but they were not, you're saying they were the highest priority item and that's just not true, is it? Well, Your Honor, I respectfully disagree. Within the broad scope of fighting a war, none of us would deny what you just indicated. However, within the subcontract and the prime contract that set the prices here, set the risks of the parties, the highest priority in that subcontract, by its plain language, were these trailers. Now, that was true at the time the subcontract was entered into. Subsequently, yes, conditions changed, but if you stay within the four corners of that contract, the plain meaning of that contract, statement of work begins. The very first statement says it's the commander's intent to bed down the troops by the given dates. Those dates were far in advance of any other dates for any other services, including food, including ammunition. Now, that may not have been a good decision, but that was implementing General Sanchez's direction to his contract's people. That was the basis for which the contract was entered into. Yes, the government can change its priorities and expect to do so, but it has contractual consequences. It can't be a contract that says, deliver these services, and I'm not going to give you a date when you're going to be able to do that, and you'll just have to go with the flow. You could have a contract like that, I suppose, but that was not this contract, and I see I'm well over my time here, so unless there are other questions, I'll stop here. Let's see, any more questions from the panel at this moment? We've preserved the rebuttal time. Not at this time. Okay, all right, so let's hear from the Secretary. Mr. Tyler. Thank you, Your Honor, and may it please the Court. This Court should affirm for three independent reasons. Mr. Tyler, could you address, please, this question of what the record shows about the basis for this $300 a day estimate? And the estimate for the number of days? Yes, Your Honor, and respectfully, I don't think that the record shows very much. I mean, there are certainly models that are used that input that figure. However, in terms of specific data, there is no specific actual cost data in the record to support that this is actually what was paid for the trucks for the drivers. So the record shows nothing other than the fact that this is an estimate that KBR thought was reasonable. But was there an audit? Did the government at that time, when all of this was being worked out and negotiated, participate in saying we need your actual numbers? There was a DCAA audit, and it resulted in costs being suspended. I don't recall whether part of that audit was looking incrementally at the different components of what KBR was billing the government for, and I don't know if it got to the micro level of looking at the reasonableness of certain estimate amounts. But the micro level is what the government relied on, isn't it? To say, no, we're not going to pay you anything because we don't like the way you came up with the numbers that you've asked for seems curious and unilateral if there, or I guess this is a question whether it is that, in terms of the obligation of the government at the time to say we want to know day by day or hour by hour what happened to your trailers that weren't able to move, how much it costs to provide your own security if that's what you did, or whatever else. To say the student costs are contractor or subcontractor, anything, we're not going to pay anything. I'm just wondering, we need to decide whether that's reasonable in view of the contract. Thank you, Judge Newman, and I would point you to your decision, or the panel's decision on which you were a member, in total procurement services,  however, damages were not warranted because there was no actual cost information to support them. So here, going back to your question and looking at what the government viewed when it considered KBR's claim, it didn't just look at the absence of actual costs, although that is the barometer in the context of an REA and the context of a cost plus contract as to what can be billed. It also looked at the nature of the contract. It's very important to keep in mind here that when DCAA went back and they were looking at what KBR did, they looked at the component prices that KBR paid, and they questioned those component prices. Breach was admitted, but that's not before us. There's no question but that there was a several months delay at the border, and I got the feeling that there was no dispute as to the disruption, and there were undoubtedly, necessarily, additional costs. The real question is, where was the obligation? Where was the instruction and the information and the basis for saying, therefore, based on I'm not sure what, we're not going to pay you anything? Yes, Your Honor, and just respectfully, I don't consider a breach to be settled in this case and don't think it can necessarily be imported. Was there a dispute as to whether there was a breach?  With respect to the issue in private security. Well, there's no question of security. Is there any question? Is the government saying they provided the security? What I see in the record is, as Judge Wallach mentioned, that the situation changed, and in terms of available personnel to be diverted to provide security for moving trailers, at that time there was a change in the military need. Yes, Your Honor, there is no question in the record, no question at all, that the government provided security for every single trailer convoy that moved. The only question in this case is the timeliness of the security. In private security, the issue was that the government didn't actually provide force protection for the food convoys because the food convoys had to move so quickly that they couldn't wait for the government to provide force protection. If food spoils before it reaches the mouth of a soldier, it's useless and performance is impossible. But trailers don't spoil, so trailers can be delayed and they're not rendered useless by a delay. Did I hear you say that the provision of force protection on which the delay is based didn't happen? I don't get that from the briefs of either side. The board found as fact, Your Honor, that the government provided convoy support for every single trailer convoy that moved. The question before the board was simply whether... When it moved. When it moved, that is correct. The question before the board was simply was, was that movement fast enough? And I do want to address a question that you asked a few moments ago before I go into the distinctions between this case and private security. You mentioned that there was a breach and that we have to operate from that basic assumption and setting aside whether we concede that there was a breach, which we do not concede here that the breach translates in this case, you still have to show that the breach results in some sort of damages, that the breach approximately causes damages, and that was not possible here based on the facts in front of the board. And the reason why it's not possible is because KBR already assumed that in the firm fixed price contract that it entered into with First Kuwaiti, that there would be some delay. And at trial, KBR did not try and disentangle. They did not try and show that the contract, the firm fixed price contract that they entered into with First Kuwaiti, failed to anticipate any particular level of delay, did not account for delay. They didn't show a change in the work that resulted from a delay. Their position before the board was that they were entitled to cost for every single day of delay, regardless of whether it rose to the level of something that was factored into the firm fixed price or not. And if that's the case, then KBR should not have paid a higher firm fixed price to account for delay. They have to show a change. And in this court's jurisprudence, when you have a firm fixed price contract, and Judge Newman, you were on two panels in cases involving firm fixed price contracts that were fairly recent, the DG21 v. Mavis case and the Lakeshore Engineering case. Well, they're all on different facts. Well, what you come up with on one set of facts certainly shows an attempt to provide uniform law. But when the facts are different, it's very difficult to translate. And here, of course, what's troubling is that here is a contract that says we want these trailers by Christmas and we'll provide security. And it wasn't provided. And it sort of seemed to go downhill from there. Judge Newman, I agree with you. The facts are very important. So I want to highlight a couple of facts here that I think are very important. Not only did KBR enter into a firm fixed price contract with First Kuwaiti to assume delay risk. They then executed change orders over the duration of that contract that extended the contract without adjusting the cost, without adjusting the scope of the work. So by executing that contract, Mr. Ho talks about how the contract has to be looked at. This is the contract case. Change orders are part of the contract. And they interpreted the provisions in the subcontract to mean that when these delays happen, this wasn't a change. We're not giving more compensation for it. The only time that KBR gave more compensation to First Kuwaiti is when it added trailers to the contract, which it did twice, in December of 2003 and April of 2004. I fail to see what that has to do with the contract with the U.S. government. Let me ask you a question about your assertion that this has to be a cost-based claim. Where does the contract between KBR and the government say that a claim for amounts paid to the subcontractor have to be calculated on a cost basis? It would seem to me that the amounts paid to the subcontractor are a cost that KBR incurred, and they'd have to show that it was reasonable. But I don't see that the calculation has to be cost-based, since the amounts paid by KBR to its subcontractor are, in fact, a cost to KBR. What am I missing? You're not missing anything in terms of a reading of the contract, Judge. I think that's accurate. It is a cost-plus contract between KBR and the government. But every single cost vouchered to the government has to be reasonable. And what makes a cost reasonable, especially in the context of an REA, is whether it is actually based on actual cost. What makes a cost reasonable in the context of a contract is a subcontract. Well, it's based on actual cost in the sense that this is what they paid to the subcontractor, so that's a cost. It's KBR's actual cost, but it's First Kuwaiti's REA, and that has to be based on actual cost, too, to be reasonable. Why? Well, I mean, obviously it has to be reasonable, but the only thing I'm challenging is whether it has to be cost-based as opposed to price-based. And I'm not seeing where there's a requirement in the KBR government contract that says a subcontractor's claim that is passed on to the government has to be cost-based. You're right, Your Honor, and it's a good question, and I appreciate it. You hit the nail on the head with respect to the interaction between the government and KBR. But with respect to First Kuwaiti and KBR, there are multiple provisions, both contractual and legal requirements for REAs, that would inform whether actual costs are required. It's important to remember here that there are multiple clauses in KBR's subcontract that not only require First Kuwaiti to provide actual costs, but also give KBR access to First Kuwaiti's actual cost. And numerous courts have held that when you fail to use leverage, when you fail to comply with basic contract terms like that, the negotiation isn't reasonable. The payment of costs under those circumstances are reasonable. Did KBR provide any explanation here as to why they didn't get cost data or other data from the subcontractor? Not initially, and that's when reasonableness is assessed. After the fact, their legal team provided two justifications. The first, both of them were rejected by the board. The first was that actual costs were not required because this was a commercial item and therefore fell into an exception. The second was an assumption that Middle Eastern contractors did not keep cost records. Again, the board rejected both of these. They rejected the commercial item argument on the basis that this was an REA. So they made no showing that other data was unavailable from the subcontractor? Correct. They made no showing that actual cost data was available, if I understand your question correctly. They did get models. They did get models from the subcontractor, Your Honor, and those models the board found relied on data that was verifiably inaccurate. They had inputs that were contradictory based on KBR's own e-mails and documentation. They found that First Kuwaiti had actual costs and actually had redacted actual cost records instead of providing them to KBR. And that all informs the reasonableness, because if you don't use the leverage that's given to you, if you just allow a subcontractor to disregard the terms of a subcontract, if you don't comply with longstanding requirements, when you're paying an REA requirements that would have been binding on you had you submitted the same cost to the government, those costs aren't reasonable. And that infects the cost that KBR billed to the government. The costs have to be reasonable when incurred. So if KBR paid something that it later billed the government and those costs weren't reasonable at the time of payment, they don't become reasonable because they were submitted to the government. Mr. Tyler, this is Judge Wallach. I want you to back up a little bit. Where in the record is that redaction? I missed that. It appears in two different places, Your Honor. It's a factual finding, but it also appears in – so the factual finding is on page 9, finding 27. It says right in the middle of the paragraph, as was the case with its double handling request, FKTC did not base its delay REA upon actual costs. For example, the truck leases FKTC submitted redacted the prices FKTC paid for trucks, thereby refusing to disclose its costs. I believe the board comes back to that in the discussion section when it's evaluating the reasonableness of the actual costs. But certainly, if actual costs were required by the contract, they're required for REAs, and even the term that KBR relies on here, 3.2.5, uses the term equitable adjustment, which is a very specific term of art in contract law, and would incorporate everything in a simple contract reading that goes with that term, the redaction of actual costs is not reasonable, especially with all those requirements. I do want to go back to some points that were raised earlier, and specifically, Judge Newman, I believe you raised the contract language and the breach issue. I want to be very clear on the contract language in this case when we're evaluating the applicability of private security. The contract language is not exactly the same. So the force protection clause in change five is the same, but there is, in the scope of work section, additional language. And because the contract has to be read as a whole, that additional language matters. It says, it is the commander's intent to rapidly bed down the remainder of CJTF-7 soldiers in accordance with established and provided priorities. Now, Mr. Ho said that those priorities were in the contract. That is incorrect. The board found that those priorities were not in the contract. But you're not saying that they should be ignored. I mean, what I'm really trying to get at here is the government's obligation to do something, whether to audit, to provide an estimate, to bring in their own estimators, as if the subcontractor is not going to provide cost of trailer figures, if that's a factor. I don't think it is. But whatever their payroll might have been as they were waiting at the border for security in order to move as a convoy. But to say that, never mind, you're going to get nothing, even though perfectly objectively the contractor KBR worked out with its subcontractors a settlement, a significant reduction in the initial request from a commercial viewpoint and from their viewpoint of service to the government. Of course, the services had already been provided to try and figure out just what in the relationship between government and the private sector, what the government's obligation may be. Are all of the burdens of everything that goes wrong, such as a dramatic increase in the military activity, is that burden, if it's not explicitly stated in the contract, to be not considered at all? Yes, Your Honor. So I believe the standard, and I think the parties agree that Essex is a standard. We think that this is the analysis that the board did. It was evaluating at what point the delay became. It crossed the line from something that was just mere delay, anticipated delay, that was known to the parties at the time of contract formation and crossed the line to a failure to perform. And it found that that didn't happen for the trailers. Your Honor, if I can just ask... No, please, let's continue until we run out of questions. I appreciate that, Your Honor. So with respect to the board's finding, the board found that this risk that was assumed was in the contract. That's a factual finding. And I can tell you, when you're talking about the interaction between government contractors and the government, what is not reasonable is for the government to pay for the same thing twice. And ultimately, that's what this case boils down to. If you disagree on the applicability of private security, if you think that that additional contract language doesn't matter, if you think that the parties' differing expectations based on that contract language doesn't matter, and you import that breach finding into this case, you still need to find proximate cause and damages. And if the costs have already been paid for because they are in the contract, then there is no proximate cause and there are no damages. And one of the board's findings that was not contested with any data, KBR quarrels with it on appeal but doesn't provide any indication that it's factually wrong, is that this particular risk, the risk that happened was in the contract. And that's not just the government's position. That was also KBR's position. Because in interpreting the same contract terms in a different contract with a different subcontractor, KBR reached the conclusion that more compensation was not allowable because the risk had already been provided for, already been allocated, the terms precluded additional compensation. And regardless of whether there is a delay and, in general, a fairness obligation of the government to come to the table and negotiate ways to fix resolutions, the government cannot pay for the same thing twice. It is not reasonable for the government to do that. But did they pay for it? I mean, here there's a brief say that a request specific to providing private security for the convoys, a request to the government to pay for it was turned down at the time. Yes, Your Honor, and that request was for free. KBR or First Kuwaiti was willing to provide that security for free, presumably understanding that the delay costs were already in the contract. In private security, what the government did is it came in and it tried to break apart a firm fixed price. It said that the part that you use to pay private security is not allowable and the rest of it is. We're not doing that here. For better or worse, we paid that entire firm fixed price. The only issue in this case is that KBR and First Kuwaiti have come back for more money, nearly over 30 percent more than the original contract value, for a delay that, as a matter of fact, the board found was anticipated. It was priced into the contract. And that's evident from the change orders. Because every single time the period of performance was extended, there was no compensation that was added. There was no change in the sublet work. This is exactly what was envisioned. And, in fact, every single change order referred back to those subcontract terms and conditions. It said, for example, in change order one, this is in accordance with the subcontract terms and conditions, stating that days lost due to convoy support shall not be taken into consideration. So they are clearly looking back. They are referencing those prior terms. And they are interpreting the contract for us. What they're saying is that what happened is not a change that warrants more compensation. And they do this over the entire life of the contract. It wasn't until the contract was over, until the government had already paid all this money, that KBR and First Kuwaiti came back for more. And they came back for a lot more. They came back for $50 million more. And the government doesn't believe, regardless of the applicability of private security, that it's reasonable for the government to pay that cost again. And that is the basis on which this court should affirm the board's decision. Okay. Any more questions from the panel? No. Judge Wallach, no. Thank you. All right. Okay. Thank you. We will hear rebuttal from Mr. Howell. Yes. Thank you, Your Honor. I think the one fundamental error that both the board made and the government in its argument, and that is that we've discussed a lot of fact-finding about what people thought about the risks, what they thought about the priorities under the contract. And only then did the board turn to interpreting the contract. But I think this court has made clear the reverse order is required. You look at the language of the contract, and you determine if it's ambiguous, and if it's not ambiguous, you stay with the plain meaning of the contract. And we think there was nothing ambiguous in the contract. When it came to the government's priorities, the trailers were prioritized over all other priorities in that contract, including ammunition support, et cetera. That was the statement in the statement of work that General Sanchez insisted upon. FKTC's right to an equitable adjustment for the delays upon a government breach could not be any more clear. That's in paragraph 3.2.5. And the provisions of the subcontract that have been provided... What does the record show about why KBR didn't do a better job of coming up with costs and proof of the damage here? Does the record show anything as to why you didn't go to the subcontractor and get better data? KBR did go to the subcontractor, and it was not able to... Why did you accept action of cost data? KBR wanted to move this matter along. Pricing data is not unacceptable. The government uses pricing data all the time in entering into any number of contracts. The requirements under the Truth in Negotiations Act is to get cost or pricing data, so pricing data is not unacceptable. It has to be shown to be reasonable, doesn't it? It does, and KBR demonstrated that by its own vetting of the marketplace, what a price for a truck idled for a day would bring, any other vendor that would charge a price for that. They vetted that and went from the $500 to the $300. Did they provide data or just statements that they vetted? They testified to that at the hearing. This is Judge Wallach. Does the record show anything about KBR's inquiries about the redacted data from the sub versus Kuwaiti? I do not believe so, Your Honor, but I can check and provide that later if that's appropriate. Yes, please continue if there's more to be covered. Well, this is Judge Wallach again. My concern is I hadn't noticed the redacted data matter, and it seems to me that it would be natural for KBR to say to First Kuwaiti, hey, wait a minute, tell us what this is. But since I didn't see that, I didn't further look to see whether there was anything, and I guess you're telling me that you don't have it at your fingertips. I do not, Your Honor. Okay. Just a couple of other points in rebuttal. Council has made reference to a series of contract changes, subcontract changes, that pushed out the date for delivery of the trailers as an indication of an understanding of the risks that it had undertaken. I don't think that's accurate. Contractors, prime contractors, will often modify subcontracts to take a contractor out of technical default, and obviously KBR and FKTC didn't understand that they were giving up and were acknowledging that these unexpected delays would not be compensable. Council mentioned the Essex case as having been adopted by the board to determine what was a reasonable time period within which the government would provide the force protection. The board never mentions the Essex case in its decision. I know there's been an attempt to bring together the fact findings that the board did make to, after the fact, assume that the board was thinking about some reasonable date, but the board said there was no date for delivery of force protection, and a contract of that nature, we believe, would not be a contract. It's unenforceable. A promise with no date to deliver on the promise is not a promise at all. And I think, finally, it was mentioned that there are multiple clauses in the contract documents, particularly the subcontract that required FKTC to produce cost data. The only provision in the subcontract that refers to cost data is the changes clause in the subcontract, and as a matter of law, government contract law, there is a difference between a change and a government delay. They are typically covered under different clauses. You can have delay associated with a change, but what we have here is pure delay. There was no change in the contract. It was a pure delay of delivery of government promise force protection, so that language in the changes clause, which is the only one that refers to cost data, is not really on point. And I guess, again, finally, discussion about what was assumed in the price that FKTC charged for its services. Once again, I think we have things in reverse. One needs to look first at the four corners of the subcontract document. The document did address, in three places, it addressed delay. One was that FKTC would be entitled to both time and money in the event the government breached its obligations, which we say it did here. The other two provisions were provisions 4.1 and 4.2, and neither of those deal with a government breach. 4.1 talks about delays in KBR convoy coordination and support. That was KBR coordination. Obviously, KBR had a role in coordinating the convoys, but that provision says nothing about a government failure to perform its obligations. And then finally, the other provision in the subcontract is section 4.2, which talks about the subcontractor FKTC taking responsibility if the contractor of KBR needed to make adjustments in working hours, manpower, equipment deemed necessary by the contractor. Again, I think that's a far cry from assuming the risk of government breach of its prime contract obligations. If there are no further questions, I thank the court. Are there any more questions from the panel? Judge Wallach, no. Okay, thanks to counsel. The case is taken under submission.